IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:08-CV-161-H

| | |
|---|---|
| PROGRESSIVE SOUTHEASTERN INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) ) ) |
| v. | ) ) **ORDER** ) |
| WILLIAM W. MCLEOD, Administrator of the Estate of ANNIE MORGAN MCLEOD, and KARON MCLEOD, | ) ) ) ) ) |
| Defendants. | ) ) |

This matter is before the court on the parties' cross-motions for summary judgment. Appropriate responses and replies have been filed, and this matter is ripe for adjudication.

### STATEMENT OF THE CASE

This is a declaratory judgment action instituted by Progressive Southeastern Insurance Company ("Progressive") pursuant to 28 U.S.C. § 2201(a) seeking a determination that a policy of motor vehicle liability insurance #110016778 ("the Policy") issued by Progressive to defendant Karon McLeod ("Mrs. McLeod") provided only $50,000 per person and $100,000 per accident of uninsured motorist (UM) coverage for an automobile

accident which occurred on March 30, 2008, and resulted in the death of Mrs. McLeod's daughter, Annie Morgan McLeod. Defendants contend that the policy provides $1 million in UM coverage benefits because Mrs. McLeod was not provided an opportunity to reject or select alternative UM coverage at the time of the initial purchase of the policy.

Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332(a)(1) based on diversity of citizenship between the parties and an amount in controversy in excess of $75,000.

Discovery having concluded, this matter is now before the court on cross-motions for summary judgment.

## STATEMENT OF THE FACTS

Annie Morgan McLeod died of injuries sustained in an automobile collision which occurred on March 30, 2008 in Wilmington, North Carolina when the car in which she was a passenger was struck by an intoxicated driver, Kelvin Caldwell. At the time of her death, Annie McLeod was twenty-two years old and a junior at the University of North Carolina at Wilmington. She is survived by her parents, William and Karon McLeod who are the heirs of her estate. Neither Mr. Caldwell, nor the vehicle he was driving, was covered by automobile liability coverage, and Mr. Caldwell is therefore defined as an uninsured motorist

for the purposes of North Carolina General Statute section 20-279.21(b)(3).

Defendant William W. McLeod ("Mr. McLeod"), in his capacity as administrator of the Estate of Annie McLeod, has now asserted a claim for UM benefits under the Policy, alleging that it affords UM coverage of $1 million for Annie McLeod's injuries sustained in the accident.

The Policy in effect on March 30, 2008 was the eighth renewal of a policy initially sold to Mrs. McLeod on November 25, 2003. Mrs. McLeod purchased the policy through the Harbor Isle Insurance Agency ("Harbor Isle") and Richard Prevatte ("Prevatte"), as an independent agent authorized to sell motor vehicle policies on behalf of Progressive and other insurers in North Carolina. The Policy declarations state bodily injury liability coverage limits of $50,000 per person and $100,000 per accident and combined UM/UIM bodily injury coverage limits of $50,000 per person and $100,000 per accident.

Mrs. McLeod first contacted Harbor Isle in the spring of 2003 to obtain a quote for automobile liability insurance coverage since her daughter Annie was preparing to obtain her driver's license. Based on the quote received from Harbor Isle, Mrs. McLeod placed her liability insurance coverage through Harbor Isle with Orion Insurance Company. In the fall of 2003,

3

Harbor Isle suggested that Ms. McLeod may want to consider changing her insurance coverage to Progressive. In November 2003, Mrs. McLeod traveled to Harbor Isle's office, stood at the counter and signed some "papers" to effectuate the change. She does not remember the substance of her conversation with any Harbor Isle employee during that office visit, nor does she have any specific recollection what "papers" she signed. (McLeod Dep. at 27-28.) She testifies that she did not review the paperwork and that "we didn't go over it." (McLeod Dep. at 31.)

Mr. Prevatte, the agent through whom Mrs. McLeod purchased the Progressive Policy has no recollection of dealing with Mrs. McLeod. Neither Mr. Prevatte nor Progressive has been able to locate a signed UM/UIM selection/rejection form for the policy or even Harbor Isle's original McLeod file. (Prevatte Dep. at 46-47.) At his deposition, Mr. Prevatte provided extensive testimony concerning his custom and habit of sitting down with each customer and going through all of the documentation with the customer, including not only the application, but also the selection/rejection form. (Prevatte Dep. at 11-13, 17-20, 39.) Using the insurance company's computer software, the agent would generate a policy application, which printed all forms necessary for completion, including a UM/UIM selection/rejection form, Form Number NC 0185. The signed application and the signed

4

selection/rejection forms were then forwarded to the carrier via the internet as well as by mail. (Prevatte Dep. at 69.) When he mailed the documents, they were typically stapled together. (Prevatte Dep. at 80.1) Prevatte and his wife were the only agents licensed to sell insurance during his time at Harbor Isle (Prevatte Dep. at 9.) Harbor Isle typically sold 25 to 30 personal motor vehicle policies each month. (Prevatte Dep. at 19.)

Progressive admits that it cannot produce a signed selection/rejection form and is unable to explain why it cannot produce the alleged selection/rejection forms forwarded to Progressive by Mr. Prevatte. Progressive has produced a six-page application signed by Mrs. McLeod, which is undated but which is designated as having been successfully uploaded to Progressive on November 25, 2003. This six-page application does not include Form NC 0185, the selection/rejection form.[1] However, Prevatte testified that based on his signature on the policy

---
[1] The Policy application bearing Mrs. McLeod's signature reflects the UM/UIM coverage limits noted above. Progressive contends that within the six-page application signed by Mrs. McLeod, the language "I hereby declare that the statements contained herein are true to the best of my knowledge and belief and do hereby agree to pay any surcharges applicable under the company rules which are necessitated by inaccurate statements. Liability coverage, Uninsured Motorists Coverage, Combined Uninsured/Underinsured Motorists Coverage, and the available limits of these coverages were explained to me, and I have selected the limits shown," is sufficient to meet the requirements of N.C. Gen. Stat. § 20-279.21(b)(3).

5

application as the producing agent and based on his customary business practices he was "[a] hundred percent sure" that Mrs. McLeod signed the application.[2] (Prevatte Dep. at 44-45.)

The Policy was renewed eight times following its issuance. Upon each renewal, Progressive mailed to Mrs. McLeod a declarations page, stating UM/UIM coverage limits of $50,000 per person and $100,000 per accident. In addition, Progressive charged and collected premiums for UM/UIM coverage consistent with the $50,000 per person and $100,000 per accident bodily injury limits.

## COURT'S DISCUSSION

### I. Standard of Review

Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

---

[2] It was unclear from the deposition whether he was testifying only that he was sure she signed the application, which is in evidence, or whether he was sure she also signed a selection/rejection form.

6

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). As this court has stated, summary judgment is not a vehicle for the court to resolve disputed factual issues. Faircloth v. United States, 837 F. Supp. 123, 125 (E.D.N.C. 1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. Faircloth, 837 F. Supp. at 125.

7

## II. Analysis

The North Carolina Motor Vehicle Safety and Financial Responsibility Act, N.C. Gen. Stat. § 20-279.1 et seq. (hereinafter the "Financial Responsibility Act" or the "Act") defines insurers' obligations for offering UM and UIM coverage on motor vehicle policies sold in North Carolina, as well as the procedural mechanism for determining the limits of such coverages. The Financial Responsibility Act, in effect at the time, provides, in pertinent part, as follows:

> No policy of injury bodily liability insurance, covering liability arising out of the ownership, maintenance, or use of any motor vehicle, shall be delivered or issued for delivery in this State with respect to any motor vehicle registered or principally garaged in this State unless coverage is provided therein or supplemental thereto, under provisions filed with and approved by the Commissioner of Insurance, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and hit-and-run motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom, <u>in an amount not to be less than the financial responsibility amounts for bodily injury liability as set forth in G.S. 20-279.5 nor greater than one million dollars ($1,000,000), as selected by the policy owner. . . . The coverage required under this subdivision is not applicable where any insured named in the policy rejects the coverage. An insured named in the policy may select different coverage limits as provided in this subdivision. If the named insured in the</u>

8

> <u>policy does not reject uninsured motorist coverage and does not select different coverage limits, the amount of uninsured motorist coverage shall be equal to the highest limit of bodily injury and property damage liability coverage for any one vehicle in the policy.</u> Once the option to reject the uninsured motorist coverage or to select different coverage limits is offered by the insurer, the insurer is not required to offer the option in any renewal, reinstatement, substitute, amended, altered, modified, transfer, or replacement policy unless the named insured makes a written request to exercise a different option. The selection or rejection of uninsured motorist coverage or the failure to select or reject by a named insured is valid and binding on all insureds and vehicles under the policy. <u>Rejection of or selection of different coverage limits for uninsured motorist coverage for policies under the jurisdiction of the North Carolina Rate Bureau shall be made in writing by a named insured on a form promulgated by the Bureau and approved by the Commissioner of Insurance.</u>

N.C. Gen. Stat. § 20-279.21(b)(3)(2002)(emphases added). Section (b)(4) contains virtually identical language and requirements for the offer, selection, and/or rejection of UIM coverage. Pursuant to the Act, the North Carolina Rate Bureau promulgated NC Form 0185 UM/UIM Selection/Rejection form, which form was approved by the Commissioner of Insurance for use by insurers in this state. See Stegenga v. Burney, 174 N.C. App. 196 (2005).

9

The Act is a "remedial statute which must be liberally construed in order to achieve the beneficial purpose intended by its enactment," which is to protect "innocent victims who may be injured by financially irresponsible motorists." Hendrickson v. Lee, 119 N.C. App. 44, 449 (1995) (internal quotations omitted). North Carolina case law has consistently held that insurance carriers must strictly comply with the selection/rejection requirements of UM or UIM coverage. Furthermore, the insurance carrier has the burden of proving the validity of rejection of uninsured coverage. Erie Insurance Exchange v. Miller, 160 N.C. App. 217 (2003).[3]

Section 20-279.21 specifically provides that the rejection of or selection of alternative UM coverage be in writing and on a form specifically promulgated by the Rate Bureau and the Commissioner of Insurance. See State Farm Mutual Auto. Ins. Co. v. Fortin, 350 N.C. 264, 269 (1999). In the instant matter, Progressive is unable to produce a selection/rejection form signed by Mrs. McLeod.

The parties cite two cases from the North Carolina courts. In State Farm v. Fortin, the insured purchased a motor vehicle

---

[3] Progressive does not dispute the existence of combined UM/UIM coverage at the amounts reflected in the policy. Progressive has already tendered payment of $50,000 in UM benefits to the Estate of Annie McLeod for injuries sustained in the March 30, 2008 accident. (Burton Aff. ¶ 18.)

policy in July of 1991 and at that time executed the appropriate selection/rejection form rejecting UIM coverage. State Farm v. Fortin, 350 N.C. 264 (1999). In October of that same year, the General Assembly amended the Financial Responsibility Act to change the amount of UM and UIM coverage available to an insured and required to be offered by an insurer. Those amendments allowed an insured to select UM and UIM coverage with limits as high as $1 million, as does the version of the statute at issue in the instant matter.

It was undisputed in Fortin that the insurer failed to obtain a new selection/rejection form from its insured following the 1991 amendments. Instead, a policy renewal form sent to the insured in 1992 advised him that if he wanted to change his previously existing UM/UIM limits, he should contact his insurance agent. The North Carolina Supreme Court held that the insurer failed to provide the insured with the proper selection/rejection form as required by the statute and, thus that there was no valid rejection. The Fortin court concluded that "because there was neither a valid rejection of UIM coverage nor a selection of different coverage limits," the statutes provides "[the claimant's] UIM coverage is $100,000 per person and $300,000 per accident," the highest limit of bodily

injury liability coverage for any one vehicle in the policy. Id. at 271.

In Williams v. Nationwide, 174 N.C. App. 601 (2005), it was undisputed that the insured had never been offered the opportunity to reject UIM coverage or select different UIM limits. The Court of Appeals distinguished Fortin, noting that "a lack of fresh choice concerning the selection of UIM coverage in a renewal form, as occurred in Fortin, is not equivalent to the situation at hand where there has been a total failure to provide the insured with an opportunity to select UIM coverage." Williams, 174 N.C. App. At 605. The court further held that "[s]uch a failure should not invoke the minimum UIM coverage limits established" in the statute and "shield the insurer from additional liability." Id. at 605-06. The Court of Appeals held that because of the "total failure" to offer the insured a choice, the insured was entitled to the maximum amount of UIM coverage available under the statute, $1 million.

Progressive asks this court to find the facts of the instant matter analogous to Fortin, while defendants argue that the facts of this case are more like Williams. As a federal court sitting in diversity, this court must apply the substantive law of North Carolina's highest court, the North Carolina Supreme Court. Private Mortgage Inv. Servs., Inc. v.

Hotel & Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir.2002). "Where the [North] Carolina Supreme Court has spoken neither directly nor indirectly on the particular issue before us, [the federal courts are] called upon to predict how that court would rule if presented with the issue." Wells v. Liddy, 186 F.3d 505, 527-28 (4th Cir. 1999). Decisions of the state's intermediate appellate court, the North Carolina Court of Appeals, "'constitute the next best indicia of what state law is.'" Id. However, decisions of that court "'may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise.'"

Although this court is troubled by the reasoning of Williams and the statutory construction it employs, this court need not determine, at this time, whether the North Carolina Supreme Court would adopt the reasoning of Williams, as there remain disputed factual issues that preclude summary judgment in this case. Unlike in Fortin and Williams,[4] it is unclear whether Mrs. McLeod was offered an opportunity to select or reject coverage and if so, whether that selection or rejection was in compliance with the statutory requirements.

---

[4] The court notes that the facts were not in dispute in either Fortin or Williams. In Fortin, the forms were in evidence. Fortin, 350 N.C. at 266-67. In Williams, the matter was presented to the trial court upon stipulated facts. Williams, 174 N.C. App. At 602.

13

As to the factual issues, Progressive contends, as it did in Progressive v. Greene, No. 1:07-CV-412 (M.D.N.C. 2008), that even though it cannot produce a signed form, it may present evidence of the habit or routine business practice of its agent, Mr. Prevatte, thereby showing that Mrs. McLeod did sign a form identical to the approved Rate Bureau form. See Fed. R. Evid. 406 (providing that evidence "of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitness, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.").

In contrast to Progressive's routine practice evidence, Mrs. McLeod's deposition reveals that she remembers going into the Harbor Isle Agency to sign some papers, but does not remember many details of the visit. She does not remember the substance of her conversation with any Harbor Isle employee during that office visit nor does she have any specific recollection what "papers" she signed. (McLeod Dep. at 27-28.) She does testify that she did not review the paperwork and that "we didn't go over it." (McLeod Dep. at 31.)

Based on these two divergent factual scenarios, the court is unable to say, as a matter of law, that Progressive did or

14

did not give Mrs. McLeod the opportunity to reject UM coverage. Accordingly, summary judgment is not appropriate at this time.

## CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment [DE #14 & #16] are DENIED. On the court's own motion, the trial of this matter is hereby continued to this court's December 14, 2010, term. The clerk is directed to reschedule the pretrial conference accordingly.

This 8TH day of September 2010.

Malcolm J. Howard
Senior United States District Judge

At Greenville, NC
#26